UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

M3 CUBED US LLC, PS US LLC, MIS US LLC, PRISM SCIENCE LLC, and MAHESH NAITHANI,

                      Plaintiffs,

         v.

SEYFARTH SHAW LLP,

                    Defendant.

**COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs M3 Cubed US LLC (f/k/a Medmeme LLC), PS US LLC (f/k/a Pharmaspectra LLC), MIS US LLC (f/k/a Medical Intelligence Solutions LLC), Prism Science LLC, and Mahesh Naithani, by and through their undersigned attorneys and for their Complaint against Defendant Seyfarth Shaw LLP ("Seyfarth"), allege as follows:

**PRELIMINARY STATEMENT**

1.    Mahesh Naithani is the founder of a suite of related companies—Medmeme LLC, Pharmaspectra LLC, and Medical Intelligence Solutions LLC (together, the "Medmeme Plaintiffs")—that collate and distribute scientific data and analytics to pharmaceutical and healthcare companies around the world.  In March 2019, Mr. Naithani engaged Seyfarth, the well-known international law firm, to represent and advise him and these companies on a sale of the companies to Inflexion Private Equity Partners LLP ("Inflexion"), a British private equity firm. Mr. Naithani informed Seyfarth that he intended to use the proceeds of this sale to fund the development of his other venture, Prism Science LLC ("Prism"), which was also represented by Seyfarth.

2.      Seyfarth negligently failed to protect the interests of its clients, the Plaintiffs, in the transaction with Inflexion, failed to accurately memorialize the agreed-upon deal terms, and failed to ensure that Mr. Naithani clearly understood and accepted the legal implications of the sale contract—the Business Purchase Agreement ("BPA")—before signing it.  As a direct and proximate result of this negligence, Mr. Naithani and the Medmeme Plaintiffs obtained less than half of what their assets were worth when the transaction closed in October 2019.  This left Mr. Naithani with approximately $50 million less to invest in Prism.

3.      In broad terms, the deal Mr. Naithani believed he was agreeing to put the value of the Medmeme Plaintiffs' at roughly $100 million, the price Inflexion offered when negotiations began.  Instead of an upfront payment of this amount, the deal ultimately negotiated involved a two-part payment structure: (i) an upfront cash payment of approximately $37 million plus $5 million in five-year Loan Notes that would pay $500,000 in annual interest; and (ii) additional "earn-out" payments of up to $49 million that would be triggered if the companies reached certain revenue thresholds in two defined periods following closing.  As he repeatedly discussed with Seyfarth, Mr. Naithani reasonably believed that the earn-out thresholds would be reached because of a pipeline of new short-term customer contracts he intended to introduce to Inflexion post-close.

4.      Because the upfront payment was so low, it was critical to the Plaintiffs' interests that the earn-outs be structured such that the new contracts Mr. Naithani planned to give Inflexion would count towards the earn-out revenue thresholds.  Mr. Naithani had explained this to Seyfarth who therefore expressly understood this fundamental element of the deal.

5.      Despite this, the BPA that Seyfarth negotiated and advised Mr. Naithani to accept, did nothing to protect his ability to secure the earn-outs (which amounted to nearly 50% of the total deal value).  To the contrary, Seyfarth agreed to remove a provision from the BPA that would

have bound Inflexion "not to do anything that would be expected to reduce the earnout where the action has no other reasonable business rationale."

6.      Without this provision, the final version of the BPA that Seyfarth greenlit gave Inflexion unfettered discretion to ensure that the revenue thresholds would not be reached and that Plaintiffs' right to the earn-out payments would never materialize.  Indeed, because the BPA was governed by English law, it did not impose an implied duty of good faith on Inflexion with respect to the earn-outs or anything else (a point that the exclusively US-qualified Seyfarth deal team failed to appreciate or advise on).  This meant that Inflexion could reject new business for no reason other than to avoid paying the earn-outs, which is exactly what happened.

7.      Even more egregiously, the BPA's definition of "Revenue" *explicitly excluded* the very contracts that Mr. Naithani expected and understood would be entered into (with the proceeds going towards meeting the earn-out thresholds).

8.      On top of that, the terms of the Loan Notes gave Inflexion discretion to subordinate them to an unlimited amount of other Inflexion debt and elect to indefinitely delay the annual interest payments that Mr. Naithani expected to receive.  Again, this is exactly what happened.

9.      To make matters worse, the BPA imposed unlimited personal liability on Mr. Naithani as guarantor of various vaguely worded warranties provided by the Medmeme Plaintiffs to Inflexion.  Seyfarth did not explain this to him, nor did they explain that Inflexion's warranties and indemnities insurance policy did nothing to limit his personal liability in any way.  Rather, Mr. Naithani first learned of the full extent of his exposure after closing, when Inflexion made a breach of warranty claim against him for over $25 million.  Mr. Naithani and the Medmeme Plaintiffs were forced to defend that claim for over a year, and were only able to exit via settlement at significant cost.

10.     For these and other reasons detailed below, Seyfarth's representation of the Plaintiffs during and after the transaction with Inflexion fell well below the expected standard of care, skill, and diligence, and constitutes legal malpractice.  Had Mr. Naithani been properly advised, he would have rejected Inflexion's lowball offer and either continued to run the Medmeme Plaintiffs himself or pursued more favorable terms with any of several other interested parties.  In fact, one such interested party—IQVIA—succeeded in purchasing the Medmeme Plaintiffs' assets from Inflexion for $105 million in 2022, more than twice the amount the Medmeme Plaintiffs received in the deal negotiated by Seyfarth.

11.     The Medmeme Plaintiffs' opportunity to sell on better terms has of course now passed, and Seyfarth's negligence has proximately caused the Medmeme Plaintiffs actual and ascertainable damages including, but not limited to, the sale of their assets at tens of millions of dollars less than they were worth, a multi-million dollar loss on the Loan Notes, and approximately two million dollars in unnecessary and wasted legal fees spent with Seyfarth and English legal counsel to attempt to rectify Seyfarth's errors.

12.     As a direct and proximate consequence of Seyfarth's negligence, Prism was deprived of approximately $50 million in funding.

13.     In short, Seyfarth's negligence caused Inflexion to be able to buy the Medmeme Plaintiffs' business and assets at a huge market discount and then sell them on, to the financial detriment of the Plaintiffs.

## <u>PARTIES AND NON-PARTIES</u>

14.     M3 Cubed US LLC (f/k/a Medmeme LLC) and MIS US LLC (f/k/a Medical Intelligence Solutions LLC) are Delaware limited liability companies with registered offices at c/o Agents and Corporations, Inc, 1201 Orange St., Ste 600, One Commerce Center, Wilmington, DE

19801.  At all times relevant to this Complaint, M3 Cubed US LLC and MIS US LLC had their principal place of business in New York.

15.   PS US LLC (f/k/a Pharmaspectra LLC) is a Delaware limited liability company with registered offices at c/o Eresdintagent, Inc, 1013 Centre Road, Suite 403s, Wilmington, DE 19805.  At all times relevant to this Complaint, PS US LLC had its principal place of business in New York.

16.   Prism Science LLC is a Delaware limited liability company with registered offices at c/o Agents and Corporations, Inc, 1201 Orange St., Ste 600, One Commerce Center, Wilmington, DE 19801.  Prism Science LLC's principal place of business was at the relevant time in New York and is now in Los Angeles.

17.   Mahesh Naithani is the sole (100%) shareholder of the Medmeme Plaintiffs and Prism.  At all times relevant to this Complaint, Mr. Naithani was a resident of New York, New York.  Mr. Naithani is currently a resident of Beverly Hills, California.

18.   Seyfarth is a law firm that holds itself out as providing specialist legal and tax advice on corporate mergers and acquisitions.  Seyfarth is a limited liability partnership organized under the laws of Illinois with its principal place of business in Chicago.  Seyfarth has offices in New York, London, and elsewhere.

19.   Non-party M3 Cubed UK Ltd. (f/k/a Pharmaspectra UK Ltd.) was incorporated under the laws of England and Wales in 2018.  Its assets were sold along with those of the Medmeme Plaintiffs.

20.   Non-party Inflexion Private Equity Partners LLP is a private equity firm headquartered in London.  Inflexion owns and/or manages the Inflexion funds which ultimately own controlling interests in Pharmaspectra Group Ltd.

21.     Non-party Pharmaspectra Group Ltd. ("PGL") was incorporated by Inflexion on July 3, 2019 under the laws of England and Wales as a special purpose vehicle to effectuate the purchase of the Medmeme Plaintiffs' assets.  PGL was the entity that operated the Medmeme Plaintiffs' business post-close.  In August 2022, Inflexion sold PGL for $105 million to health information company IQVIA (which in 2019 had competed with Inflexion to buy the Medmeme Plaintiffs' assets from Mr. Naithani).

22.     Non-party Pharmaspectra US LLC was incorporated by Inflexion on July 15, 2019 under the laws of Delaware as a special purpose vehicle to effectuate the purchase of the Medmeme Plaintiffs' assets.

23.     Non-party Jeremy Moulding was appointed as Chief Executive Officer of PS US LLC on September 7, 2018, and later became a director of Pharmaspectra UK Ltd.  Mr. Moulding was retained by Inflexion to serve as PGL's Chief Executive Officer following the transaction with Plaintiffs.  In 2021, Seyfarth, on behalf of Plaintiff PS US LLC, sued Mr. Moulding in this Court for allegedly conspiring with Inflexion to deprive PS US LLC of millions of dollars.  After being removed to federal court, this lawsuit was dismissed for lack of subject matter jurisdiction on November 30, 2021.

24.     Non-party Medmeme Informatics Private Limited ("Indian Seller") is a company incorporated under Indian law.  Indian Seller was jointly owned by Medmeme and Mr. Naithani's sister (Mrs. Sudha Sharma). Prior to the sale to Inflexion, it provided support services to the Medmeme Plaintiffs' business.

## JURISDICTION AND VENUE

25.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because there is complete diversity of citizenship between the Plaintiffs and Defendant and the amount in controversy exceeds $75,000, exclusive of costs and interest.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

## FACTUAL BACKGROUND

### I.     Timeline of the Transaction with Inflexion

27.     The Medmeme Plaintiffs were founded, and remain 100% owned, by Mr. Naithani. Prior to the transaction with Inflexion, these companies were leading global providers of medical affairs data to the healthcare industry, with offices in the UK, US, Switzerland, and India.

28.     In or around January 2019, Mr. Naithani began exploring options to secure strategic third-party investment into the Medmeme Plaintiffs.  He received investment and/or buy-out proposals from at least eight companies, including Inflexion.

29.     On March 22, 2019, Inflexion delivered a detailed, 33-page Letter of Intent ("LOI") specifying the preliminary terms on which it would consider purchasing the Medmeme Plaintiffs. The LOI proposed a purchase price of approximately $100 million (comprised of an upfront cash payment of $94 million and the assumption of $6 million of the Medmeme Plaintiffs' debt).  The LOI further stated that Inflexion would cooperate with Mr. Naithani in new non-competing business opportunities. Preliminary purchase offers were also received from at least two other parties, including IQVIA, who both valued the Medmeme Plaintiffs' at between $55 million and $97 million.

30.     At around the same time, Mr. Naithani retained Seyfarth to act as his and the Medmeme Plaintiffs' legal advisor in connection with a sale of their assets.  Mr. Naithani also retained Seyfarth to represent his other business, Prism, in matters related to the sale of the Medmeme Plaintiffs' assets.  Seyfarth continued to represent the Plaintiffs until at least on or about March 15, 2022.

31.     Although Mr. Naithani had signed an engagement letter with Seyfarth in April 2016 for legal advice pertaining to the "corporate, tax and transactional" matters of Medmeme LLC (the predecessor entity of Plaintiff M3 Cubed US LLC), no formal engagement letter was entered into to memorialize Seyfarth's engagement with respect to the Inflexion transaction.  On information and belief, the Seyfarth lawyers who acted for Plaintiffs on this deal were based primarily in Washington, D.C.  Inflexion's lawyers were English solicitors at Trowers & Hamlins LLP ("Trowers"), a London law firm.

32.     At the outset of their retainer, Mr. Naithani informed Mr. Andrew Sherman of Seyfarth (the lead partner) that he intended to use the capital raised from the sale of the Medmeme Plaintiffs to invest in Prism, expand his existing medical databases, and develop new products using artificial intelligence and blockchain technology.

33.     Following further discussions between Mr. Naithani, Seyfarth, Inflexion, and Trowers, on April 7, 2019 Mr. Naithani entered into an exclusivity agreement with Inflexion. Shortly thereafter, Inflexion began the due diligence process.

34.     In the course of due diligence, Inflexion significantly departed from the terms set forth in its LOI by, among other things, proposing to purchase just the Medmeme Plaintiffs' business and their core assets (together, the "Business"), as opposed to the entities themselves.  On June 7, 2019, Inflexion amended its initial offer even further by replacing the $94 million cash payment with (i) a significantly smaller upfront cash payment, and (ii) two large earn-out payments (the "Additional Payments") that would be contingent on the Business achieving certain revenue targets in the months following close of the sale.

35.     Although the exact size of the Additional Payments remained subject to further negotiation, by this point it was clear that they were a significant portion of the total consideration

Inflexion proposed to pay.  As such, Seyfarth understood that the Additional Payments were fundamentally significant to the Plaintiffs and that maximizing the likelihood that the Additional Payments would be paid was a uniquely important objective for them.  Seyfarth also understood that, because the Additional Payments would be triggered based on revenues earned after Mr. Naithani and the Medmeme Plaintiffs relinquished control of the Business, contractual protections were essential to prevent Inflexion from purposefully missing the revenue targets.

36.     Reflecting this understanding, on July 25, 2019, Seyfarth sent Inflexion a draft BPA that included a provision (the "Proposed Buyer Undertakings") requiring Inflexion to:

(i)      "Run the business in accordance with sound and good business practice and on sound and sustainable commercial profit-making principles;" and

(ii)     "Not do anything that would be expected to reduce the earnout where the action has no other reasonable business rationale, nor to do anything with the intention of avoiding, reducing, excluding, deferring, or manipulating the earnout."

37.     On August 3, 2019, Inflexion deleted the Proposed Buyer Undertakings from the draft BPA.  As further evidence that Seyfarth understood the importance of the Proposed Buyer Undertakings, Seyfarth rightly objected to their deletion in an email to Trowers on August 8, 2019. Seyfarth wrote that "Not only are such provisions consistent with market practice, but it is even more critical in this case that reasonable protections be provided given that the earnout comprises almost 50% of the purchase price."  Seyfarth then re-inserted the Proposed Buyer Undertakings in the next round of edits on August 23, 2019.  They were once again deleted by Inflexion in a draft BPA circulated in early September.

38.     In the same draft, Inflexion proposed an extremely narrow definition of the revenue that would count towards the Additional Payments' earnings thresholds.  Specifically, the proposed definition of "Revenue" was limited to gross income from (i) contracts with a duration

of twelve months or longer, (ii) that were with pharmaceutical companies (as opposed to biotech and other healthcare providers and other buyers of medical affairs data), and (iii) that involved just three of the Medmeme Plaintiffs' products (Link, Delta, and Insightmeme).  Because all the new contracts Mr. Naithani wanted to give the Business after the sale were for durations of less than one year, included buyers who were not pharmaceutical companies, and/or included products or services which were not Link, Delta, or Insightmeme, this revised definition expressly excluded them.

39.     On September 10, 2019, a Seyfarth lawyer drafted an email noting that Revenue, if defined as Inflexion requested, "calls into question whether the revenue from the new contracts being signed will be included."  Although this was a vital point, this email was circulated only to Seyfarth lawyers internally (Mr. Sherman and another a senior attorney, Mr. Stanley Jutkowitz). Seyfarth negligently failed to send the advice to Mr. Naithani or any member of his team.

40.     During a teleconference on September 11, 2019, Mr. Moulding, without having received competent advice from Seyfarth as to the effect of the deletion of the Proposed Buyer Undertakings (which would and should have reflected the draft advice referred to above), agreed to their deletion and the inclusion of Inflexion's highly restrictive definition of Revenue.  On September 12, 2019, Trowers circulated a revised draft BPA that included both of these changes.

41.     In combination, these changes significantly diminished—if not eliminated—the chances that Mr. Naithani and the Medmeme Plaintiffs would ever receive the Additional Payments; particularly since, without the Proposed Buyer Undertakings, the BPA—which was expressly governed by English law—contained no implied duty of good faith and therefore permitted Inflexion to intentionally avoid reaching the Revenue triggers (even if that involved refusing new business without any commercial justification).  Further, as Seyfarth recognized, the

definition of Revenue meant that none of the new short-term contracts would count towards the earn-outs, even if they were accepted by Inflexion.

42.    Seyfarth, having appreciated the legal and commercial significance of these provisions to the overall deal terms, negligently failed to advise the Plaintiffs of that significance. On information and belief, Seyfarth neglected to consult with any English qualified lawyers (despite having an office in London) and apparently believed, incorrectly, that English law recognized a free-floating, implied good faith obligation that would serve the same function as the Proposed Buyer Undertakings.

43.    Indeed, Seyfarth said as much in a letter to Inflexion after the deal closed: "It is a well-established and globally accepted M&A principle that a buyer cannot take affirmative steps to prevent or forsake the ability of a seller from achieving consideration due pursuant to an earn-out."  This is clearly incorrect: under English law, unless a contract expressly prohibits such conduct, it is permitted.  As such, the structure of the execution version of the BPA made it highly unlikely that Inflexion would make any effort to partner with Plaintiffs to generate Revenues post-close.  Put simply, the Additional Payments, and in particular the large payments keyed to Revenues in the three months immediately after closing, were almost certainly not going to be paid.

44.    Seyfarth's negligent failure to properly advise Mr. Naithani on how the BPA's earn-out provisions would function under English law caused Mr. Naithani to agree to Inflexion's revised proposal and move forward towards closing the transaction on October 4, 2019 (the "Sale Transaction").  On information and belief, Seyfarth collected approximately $2.25 million at or around the close of the Sale Transaction to cover amounts they had already billed their clients, work in progress, and anticipated future fees.

45.    The main terms of the Sale Transaction were set forth in the BPA and a separate loan note instrument (the "LNI").   Both documents specified that they were to be governed and construed in accordance with English law.   While Inflexion's lawyers were English qualified, Plaintiffs' team at Seyfarth were not.

### *The Business Purchase Agreement (BPA)*

46.    Per the BPA, Mr. Naithani and the Medmeme Plaintiffs agreed to sell the Business to Inflexion's special purpose entity, PGL.   In return, the Medmeme Plaintiffs were entitled to receive: (i) a roughly $38 million cash payment ($6.5 million of which was to be paid into an escrow account (the "Escrow Amount")); (ii) $5 million in Loan Notes carrying 10% interest that were issued by Pharmaspectra US LLC (Inflexion's US SPV); and (iii) Additional Payments totaling up to $49.5 million that were contingent on the Business meeting certain revenue targets in the post-sale period.

47.    Thus, excluding the Additional Payments, the BPA called for consideration of ~$43.2 million, less than half of the $100 million enterprise value given by Inflexion in its LOI. This consideration was split between each of the Medmeme Plaintiffs as follows: 3.95% to MIS US LLC; 12.88% to PS US LLC; and 83.17% to M3 Cubed US LLC.   As Seyfarth was explicitly told by Mr. Naithani, all or almost all of the consideration received from Inflexion pursuant to the earn out was earmarked to be invested into Prism.

48.    Schedule 11 of the BPA set forth the terms of the Additional Payments (referred to in the contract as the First and Second Additional Price).   Payment of the First Additional Price was contingent on the Business's Revenues in calendar year 2019 (the "First Additional Price Period"):

| Revenue Threshold | First Additional Price |
|---|---|
| $14M to $14.5M | $13.5M |

| $14.5M to $15M | $18.5M |
|---|---|
| $15M to $15.5M | $23.5M |
| $16M to $16.5M | $33.5M |
| $17M+ | $38.5M |

49.     Payment of the Second Additional Price was contingent on the Business hitting revenue targets in the twelve-month period from July 1, 2019 to June 30, 2020 (the "Second Additional Price Period"):

| Revenue Threshold | Second Additional Price |
|---|---|
| $17M to $22.5M | $6M |
| $22.5M to $25M | $8.5M |
| $25M+ | $11M |

50.     For purposes of the Additional Payments, the term Revenue was defined to mean:

[T]he gross income of the Buyer [PGL] in respect of contracts with a duration of 12 months or more (whether entered into before or after the Completion Date) with pharmaceutical companies (such companies being but not limited to customers under the Customer Contracts) for the provision of the Link, Delta or Insightmeme products and exclusive of (i) any sales tax and (ii) any income generated as a result of any share or business acquisition of any nature and/or any joint venture arrangements and calculated in the same manner as calculated by the Sellers prior to the Completion Date (which for the avoidance of doubt was in accordance and compliance with International Financial Reporting Standards (IFRS)).

51.     As is typical in corporate M&A, the BPA required the buyers and sellers to provide reciprocal warranties and guarantees.  On the sellers' side, the Medmeme Plaintiffs provided warranties (the "Warranties") in relation to the truth and accuracy of, among other things, the financial data reflected in their "Management Accounts."  The BPA defined the term "Management Accounts" to mean "the 2019 booked revenue spreadsheet from January 2019 to December 2019 in the agreed form."

52.     Problematically, the BPA did not include any reference to specific accountancy rules that would be applied to the Management Accounts or specify what the "agreed form" of the revenue spreadsheet was.  As such, the BPA left it entirely unclear what accounts or revenue

spreadsheets fell within the scope of the Sellers' Warranties, creating a material risk that Inflexion could manufacture a claim that the Warranties had been breached. Seyfarth negligently failed to advise the Plaintiffs of this risk and failed to insist upon non-ambiguous Seller's Warranties in the BPA so that this risk would be minimized.

53.    Compounding this error, the BPA required Mr. Naithani to personally guarantee the Warranties on a joint and several basis with the Medmeme Plaintiffs; and while an aggregate cap of $12.5 million was placed on the Medmeme Plaintiffs' liability for breaches of the Warranties, this cap did not apply to Mr. Naithani. This meant that Mr. Naithani's personal liability exposure for breaches of the Warranties was unlimited. Seyfarth negligently failed to advise Mr. Naithani of the extent of this exposure and he was left to believe—incorrectly—that the $12.5 million cap applied to him as well.

54.    Mr. Naithani also believed—based on Seyfarth's advice—that his liability would be offset by any claims made by PGL under a $12 million warranties and indemnities insurance policy (the "W&I Policy), which the Medmeme Plaintiffs had funded for the benefit of PGL. Yet although the BPA provided that the Medmeme Plaintiffs' liability for breaches of the Warranties would be reduced by any proceeds recovered under the W&I Policy, this set-off did not apply to Mr. Naithani's personal liability (which remained unlimited). Again, Seyfarth negligently failed to advise Mr. Naithani of this critical point.

55.    Seyfarth also failed to include, or negotiate for, a provision in the BPA that would have prevented PGL/Inflexion from "double recovering" against Mr. Naithani in the event that a claim under the W&I Policy was paid out. On information and belief, this error was caused by Seyfarth's lack of awareness that, under English law, the existence of insurance does not necessarily negate the risk of double recovery as a matter of law and public policy. Accordingly,

Mr. Naithani was left to believe—incorrectly—that the proceeds of any claim on the W&I Policy would reduce his personal liability.

56.     In a counterclaim that PGL brought in the English High Court against the Medeme Plaintiffs and Mr. Naithani (the "Warranty Counterclaim"), PGL took the position, as a result of these failures, that they were entitled to a double recovery against Mr. Naithani.  The Warranty Counterclaim and incurred legal costs—at least as against and incurred by Mr. Naithani—could have been avoided had Seyfarth made clear in the BPA that there could be no double recovery and that any insurance payout must first be deducted from, offset against, and reduced by any such claim in respect of any alleged damage suffered by PGL.

### *The Loan Note Instrument (LNI)*

57.     As noted, $5 million of the upfront purchase price for the Business took the form of Loan Notes issued by non-party Pharmaspectra US LLC to Plaintiff M3 Cubed US LLC (formerly Medmeme).  The Loan Notes were governed by the LNI, which was executed on October 4, 2019 alongside the BPA.  Like the BPA, the LNI specified that it was to be governed and construed in accordance with English law.

58.     Under the LNI, the Loan Notes were unsecured obligations of Pharmaspectra US LLC for the payment of the $5 million principal and 10% annual interest, which, if unpaid, would accrue at the end of each twelve-month period following issuance of the Loan Notes. These obligations were guaranteed by another Inflexion entity (Pharmaspectra Topco Ltd.).

59.     While the Loan Notes were to rank pari passu with Pharmaspectra US LLC's other unsecured debt obligations, repayment of the Loan Notes (plus accrued interest) was due only (i) if such payment was "permitted by the terms of any Facilities Agreement" and (ii) if Pharmaspectra US LLC "had paid the Priority Note Payment to the Priority Noteholder."

60.     The term "Facilities Agreement" was defined by the LNI to mean: "any term and/or revolving facilities agreement(s) entered into by any member of the [Inflexion] Group and designated by [Pharmaspectra US LLC] as a Facilities Agreement for the purposes of [the LNI] as the same may be amended, supplemented, extended, novated or restated from time to time."  This provision gave Inflexion wide latitude to further subordinate the Loan Notes by incurring additional debt after the LNI was executed.

61.     The term "Priority Note Payment" was defined by the LNI to mean: "the sum of £20,000,000 constituting part of the principal amount payable by the Issuer pursuant to the Priority Note Instruments."  The term Priority Note Instruments was defined, in turn, to mean two loan note instruments—the "A1 Loan Note Instrument" and the "A2 Loan Note Instrument"—to be issued by Pharmaspectra Midco 1 Ltd. (another company under the control of Inflexion) to the Priority Noteholder (defined to mean three other Inflexion entities, collectively).

62.     The structure of the LNI therefore made payment on the notes subordinate to (i) any loan agreement that Pharmaspectra US LLC elected to designate as a Facilities Agreement and (ii) the £20 million Priority Note Payment.  As such, the LNI did not reflect the commercial terms that Mr. Naithani and the Medmeme Plaintiffs agreed to during negotiations, which was that (i) the Loan Notes would be subordinate to the Priority Note Payment only and (ii) the interest payment would be paid annually.

63.     Seyfarth not only negligently failed to notice this highly material difference or advise Plaintiffs about it, but Seyfarth also neglected to request or obtain copies of any of the Facilities Agreements, Priority Note Instruments, or any other financial disclosures that would have allowed the Plaintiffs to assess the prospects of recovering the principal and interest on the Loan Notes when they fell due.

*India Sale*

64.     As part of the Sale Transaction, the Indian Seller entered into an agreement to sell its business and assets (the "Indian Sale Agreement") to an Indian company ultimately controlled by Inflexion for the Indian rupee equivalent of USD 1,320,000.

*65.*     Seyfarth knew that Mr. Naithani intended to invest the sale proceeds (including the Indian sale proceeds) into Prism, and that Mr. Naithani intended to operate Prism internationally. However, Seyfarth failed to advise that the Indian sale proceeds could be invested into Prism without bringing the money into the US (e.g., by investing into an offshore subsidiary of Prism). The competent advice Seyfarth should have provided to Medmeme and Mr. Naithani was to keep the Indian sale proceeds offshore, so as to avoid any liability to pay US taxes, and seek to invest the sale proceeds indirectly into Prism in a nil- or low-tax offshore jurisdiction, given Prism's known intended international focus.

66.     Furthermore, the India Sale Agreement provided for payment of the Indian purchase price wire transfer of readily available funds into the bank account of the Indian Seller.

67.     However, there was no commercial or legal reason to route the India sale proceeds through India.  The Indian seller had no post-closing debts to pay: nor did it have any operational need for cash, as it had no post-closing business or operations.  The majority owner of the Indian Seller (Medmeme) was not incorporated or domiciled in India.   The minority owner, Mr. Naithani's sister, was content to allow Mr. Naithani or his companies to receive and direct the payment and use of her share of the India sale proceeds.

68.     Mr. Naithani therefore told Seyfarth not to route India sale proceeds through India. However, Seyfarth failed to follow Mr. Naithani's instructions or inform the Indian lawyers of Mr.

Naithani's instructions.  Contrary to Mr. Naithani's instructions, the Indian Sale Agreement wrongly provided for the Indian purchase price to be paid to the Indian seller's bank account, contrary to Mr. Naithani's express instructions.

69.    Seyfarth also failed to advise that the mechanism for payment of the Indian sale price should include a simultaneous exchange of sold assets and purchase price at closing, so that the Indian Seller, Medmeme, and Prism would not be exposed to the risk of Inflexion and its Indian purchasing entity delaying or withholding the Indian purchase price. Instead, the Indian Sale Agreement provided for payment of the purchase price ten business days after closing.

## II.    Events Following the Sale Transaction

### *The Medmeme Plaintiffs Fail to Achieve the Additional Payments*

70.    Beginning on October 7, 2019, just three days after the Sale Transaction closed and pursuant to Seyfarth's negligent advice, Mr. Naithani embarked on a diligent attempt to collaborate with Inflexion to ensure that the Revenue targets for the First Additional Price would be met. Specifically, Mr. Naithani sought to obtain a post-completion license to resell data for PGL and to otherwise use the data without competing with PGL.  Mr. Naithani and the Medmeme Plaintiffs also sought to introduce new business to PGL, so as to earn themselves valuable million-dollar introduction fees and to help PGL achieve the earn-out revenue targets.  Mr. Naithani and others on his team had discussed this plan with Seyfarth on multiple occasions prior to completion of sale to Inflexion.

71.    Despite having been expressly instructed to ensure that these business opportunities could be introduced, Seyfarth negligently failed to advise that such matters had to be agreed prior to completion and negligently failed to obtain the necessary consents from Inflexion prior to completion.  Instead, and contrary to their duties to Plaintiffs, Seyfarth negligently forgot or intentionally failed to act on their instructions.  After completion, Seyfarth recognized its mistake

but then negligently and incorrectly advised Mr. Naithani that Seyfarth's omission would not matter because of PGL's obligation of good faith (which, under English law, PGL did not actually owe) and belatedly attempted to obtain the necessary consents.

72.     Had Seyfarth acted competently, it would have advised that the necessary consents from Inflexion had to be negotiated and obtained prior to, not after, completion, so as to allow Mr. Naithani and the Medmeme Plaintiffs to negotiate or withdraw.

73.     By mid-to-late October, the Plaintiffs had introduced various new business opportunities (the "NB Opportunities") to Inflexion that would have reasonably been expected to push the Business's 2019 Revenues above $17 million (and thereby trigger a First Additional Payment of up to $38.5 million to the Medmeme Plaintiffs).  At the very least, the NB Opportunities would have almost certainly created total Business Revenues in 2019 of more than $14 million (the threshold for a First Additional Payment of $13.5 million).

74.     These efforts were met with delays, non-responsiveness, and stonewalling. Although a surprise to Mr. Naithani, Inflexion's lack of concern about increasing the Business's Revenues before the end of the First Additional Price Period at the end of 2019 was a predictable consequence of the BPA that Seyfarth negotiated and signed-off on: without the Proposed Buyer Undertakings, and without the implied good faith obligation that Seyfarth wrongly believed the BPA contained, there was no contractual or commercial incentive for Inflexion to do anything to push Revenues beyond the minimum earn-out threshold of $14 million through acceptance of the NB Opportunities or otherwise.  Mr. Naithani and his team repeatedly followed up with Inflexion about the NB Opportunities but received no substantive response.

75.     On December 4, 2019, Seyfarth sent Inflexion a draft Strategic Alliance Agreement and Modification of Additional Price Terms (the "SAA") between the Medmeme Plaintiffs, their

affiliate Prism, and PGL.  Recognizing that it had failed to protect the Plaintiffs' interest under the BPA in the Additional Payments, Seyfarth included provisions in the SAA that, had they been accepted, would have retrospectively corrected several of the errors Seyfarth originally made in advising the Plaintiffs.  For example, the SAA included a provision that would have required Prism and PGL to "collaborate with one another" and "use reasonable best efforts to maximize [certain new] revenue streams" that Prism had offered PGL.

76.     Similarly, because the restrictive definition of Revenue that Seyfarth negligently agreed to in the BPA precluded these revenue streams from counting towards the Additional Payments, the SAA provided that "the aggregate of all revenue received by [PGL], whether independently generated by [PGL] or related to or arising from this Agreement . . . shall be treated as Revenue as defined in the Purchase Agreement and included in the Additional Price calculations payable to the Sellers pursuant to the Purchase Agreement, as modified herein."   And in recognition of the fact that the Additional Price Periods in the BPA made it highly unlikely the Plaintiffs would receive the Additional Payments, the SAA proposed extending them by a further three months.

77.     Given that the deal had completed some two months earlier, Plaintiffs had no bargaining power or leverage.  It was too little, too late.

78.     On December 23, 2019, Inflexion responded with an unworkable markup of the SAA, with no reasonable time in which to finalize an agreement and convert the NB Opportunities by the end of the First Additional Price Period on December 31, 2019.  Predictably, then, the SAA was never agreed to by Inflexion.  Because of Inflexion's contractually permitted refusal to act on the NB Opportunities under the BPA, the Business' revenue fell short of $14 million by the end

of the First Additional Price Period and the Medmeme Plaintiffs were accordingly not entitled to the First Additional Price.

79.     On January 19, 2020, Seyfarth wrote to Inflexion to set out Plaintiffs' concerns that Inflexion was intentionally obstructing Plaintiffs' ability to earn the Additional Payments. Seyfarth wrote: "It is a well-established and globally accepted M&A principle that a buyer cannot take affirmative steps to prevent or forsake the ability of a seller from achieving consideration due pursuant to an earn-out."  As noted, this is a flatly incorrect statement insofar as English law is concerned and demonstrates that Seyfarth incorrectly believed that the BPA imposed obligations on Inflexion to act in good faith with respect to the Additional Payments.  This critical misunderstanding is the crux of Seyfarth's negligence and the source of the bulk of Plaintiffs' damages in this case.

80.     By the end of the Second Additional Price Period on June 30, 2020, the Business had not achieved the minimum Revenue threshold of $17.5 million and Plaintiffs consequently did not receive the Second Additional Price.  Had the NB Opportunities been acted upon, and had Revenue been defined to include them, the Business would have reasonably been expected to achieve Revenue of at least $25 million in the Second Additional Price Period (which would have entitled the Medmeme Plaintiffs to a payment of $11 million).

81.     Plaintiffs' inability to achieve any Additional Payments was a direct result of Seyfarth's negligent failure to insist upon inclusion of the Proposed Buyer's Undertakings and/or an express good faith provision into the BPA, and/or a definition of Revenue that included the NB Opportunities.  Because the BPA contained no such protection for the Medmeme Plaintiffs, and because English law imposes no implied duty of good faith into commercial contracts, Inflexion was free to—and did—reject the NB Opportunities so as to deny the Medmeme Plaintiffs the

Additional Payments.  Had Seyfarth fulfilled its duty to advise Mr. Naithani that this is how the BPA would function, he would have never agreed to it.  Although Plaintiffs during 2020 engaged PGL vigorously in arguments over their calculations of revenue and entitlement to Additional Payments, Plaintiffs were forced to conclude that the Additional Payments had been lost.

82.     With part of the proceeds of the sale, Mr. Naithani funded Prism, which provides data analytics solutions for the life sciences industry.  The initial growth and profits of Prism have been reduced as a direct result of Plaintiffs not achieving the Additional Payments, starving the business of the working capital that it required.  This was a foreseeable result of Seyfarth's negligence, who acted for Prism and had been expressly told of Mr. Naithani's plans to use the capital realized from the sale of the Business (specifically the earn out) to fund Prism.

83.     Based on Mr. Naithani's track record with other businesses he has founded, had the Additional Payments been achieved, they would have translated into an increase in Prism's valuation of between approximately $100 million to $500 million.

### *Seyfarth Points the Finger at Jeremy Moulding*

84.     Instead of acknowledging its own negligence with respect to the BPA, Seyfarth convinced Mr. Naithani that the reason Plaintiffs did not receive the Additional Payments was an illicit conspiracy between Inflexion and Jeremy Moulding, PGL's CEO.  Seyfarth advised Mr. Naithani that Mr. Moulding's supposed misconduct was actionable in New York and that legal proceedings should be commenced against him for damages.

85.     Mr. Naithani was led to believe that the discovery phase of this lawsuit would uncover evidence that would show wrongdoing by Mr. Moulding and/or Inflexion, which could then serve as the basis of an action in the English courts for breach of the BPA.  Expressly or

implicitly included within Seyfarth's legal advice on this point was that the case against Mr. Moulding would survive a motion to dismiss and proceed to discovery.

86.     Acting on Seyfarth's advice, and at considerable legal expense paid to Seyfarth, PS US LLC filed a claim for damages against Mr. Moulding in New York State Supreme Court on October 6, 2020.  The case was subsequently removed to this Court (1:21-cv-1049-VEC).

87.     On November 30, 2021, Mr. Moulding's motion to dismiss the complaint under Fed. R. Civ. P. 12(b)(1) was granted by the district court for lack of subject matter jurisdiction as to all counts.  Again acting on Seyfarth's advice, on December 30, 2021, PS US LLC filed a Notice of Appeal in the United States Court of Appeals for the Second Circuit.  On February 28, 2022, PS US LLC stipulated to the withdrawal of the appeal with prejudice.  Mr. Naithani and the Medmeme Plaintiffs paid Seyfarth approximately $200,000 in legal fees in connection with the failed litigation against Mr. Moulding.

### *PGL Refuses to Release the Escrow Amount*

88.     Per the terms of the BPA, $6.5 million of the purchase price was to be held in escrow for up to four years following closing.  This Escrow Amount was intended to serve as a reserve of funds that could be drawn upon by PGL in case of any losses caused by the Medmeme Plaintiffs' breaches of warranty.  If a breach of warranty claim was not made before the First Escrow Date on December 31, 2020, $2.1 million of the Escrow Amount would be released to the Medmeme Plaintiffs.

89.     By letter to the Medmeme Plaintiffs dated December 23, 2020, PGL claimed losses caused by the Medmeme Plaintiffs' alleged breach of the BPA's Warranties.  In light of this claim, PGL refused to the release the initial $2.1 million from escrow.  At around the same time, PGL made a claim under its W&I Policy.

90.     On March 6, 2021, the Medmeme Plaintiffs issued a claim (the "Escrow Claim") against PGL in the English High Court seeking a declaration that (i) PGL's claim was invalid and (ii) that the Medmeme Plaintiffs were entitled to release of the $2.1 million.

91.     On April 21, 2021, PGL responded with the Warranty Counterclaim, in which it alleged that the Medmeme Plaintiffs had breached the BPA's Warranties with respect to its historical financial statements and revenue recognition methodologies.  Per an amendment to the Warranty Counterclaim served on October 14, 2021, PGL alleged damages of approximately $25.9 million. Because Seyfarth failed to limit Mr. Naithani's personal liability with respect to the Warranties in any way or protect him against the risk of PGL's double recovery, the Warranty Counterclaim exposed him to a potential adverse judgment of at least $25.9 million (plus PGL's legal costs).

92.     On April 8, 2022, the Medmeme Plaintiffs, Mr. Naithani, PGL, and other related parties entered into a confidential settlement agreement.

### *Pharmaspectra US LLC Fails to Make Interest Payments on the Loan Notes*

93.     On or about October 4, 2019, and without the knowledge or consent of Mr. Naithani or the Medmeme Plaintiffs, an unrelated Inflexion entity (non-party Pharmaspectra Midco 1 Ltd.) issued a new series of £21.6 million loan notes (the "A3 Loan Notes"), fully guaranteed and secured by Pharmaspectra Topco Ltd.  This had the effect of subordinating the Medmeme Plaintiffs' Loan Notes to a further £21.6 million in Inflexion debt.

94.     Per the terms of the LNI, Pharmaspectra US LLC paid the Medmeme Plaintiffs the first annual instalment of interest on the Loan Notes in the sum of $500,000 on October 4, 2020.

95.     On September 8, 2021, shortly before the second interest payment was due, Pharmaspectra US LLC unilaterally amended the Priority Note Instruments to include a provision

stating: "[A]ny and all interest due under the [Loan Notes] shall be rolled up and compounded so that it becomes a principal amount of the notes then outstanding and shall become payable in cash . . . on the Redemption Date [in October 2024]."  This amendment—to which the Loan Notes were subject pursuant to the LNI—thus permitted Pharmaspectra US LLC to defer its annual interest payment to the Medmeme Plaintiffs until at least 2024.

96.    In accordance with this amendment, on or around October 4, 2021, Pharmaspectra US LLC withheld and capitalized its second annual $500,000 interest payment.

97.    The amendments to the Priority Note Instruments and their impact on the Loan Notes further increased the risks that the Loan Notes and their accrued interest would not be repaid. Seyfarth negligently failed to advise Mr. Naithani and the Medmeme Plaintiffs that the LNI permitted deferral of the annual interest payment of further subordination of the Loan Notes.

### *Delayed payment under the Indian Sale Agreement*

98.    Predictably, payment of any of the Indian purchase price was delayed for more than a year after its due date under the Indian Sale Agreement, causing the Indian Seller and the Plaintiffs to forfeit the benefit of capital gains tax roll over relief, denying Prism further working capital and further delaying Prism's growth.  The Indian Sale Agreement did not include an effective mechanism for enforcing the Indian buyer's debt.  Instead, it included a dispute resolution provision requiring arbitration seated in Bangalore, India under Singapore arbitration rules. Seyfarth negligently failed to advise the Plaintiffs that this was inappropriate in circumstances in which, as Seyfarth knew, neither the Plaintiffs nor the Indian Seller intended to retain any staff or presence in India after the sale.  Seyfarth therefore knew or ought to have known that Plaintiffs would be disadvantaged by having to arbitrate in India as well as issuing proceedings in England in the event of a dispute with PGL under the BPA.  Had Seyfarth acted competently, it would have

negotiated the Indian Sale Agreement to allow Plaintiffs to have all disputes determined in one place and venue, either in the US (the Plaintiffs' home territory) or England (PGL and Inflexion's home territory and the exclusive jurisdiction for determination of all other disputes under the BPA).

### *Inflexion Resells the Business*

99.     On or about August 8, 2022, Inflexion sold the Business for $105 million to health information company IQVIA, a company which in 2019 had competed with Inflexion to buy the Business from Mr. Naithani and the Medmeme Plaintiffs.  The amount IQVIA paid was more than twice what Plaintiffs received from their own deal with Inflexion just three years earlier.

100.    Reflecting how drastically the BPA negotiated by Seyfarth had undervalued the Business, Inflexion was able to sell the Business to IQVIA for a mark-up of about $54 million despite the fact that the Business's revenues and profits fell significantly after Inflexion bought it.

## III.    Seyfarth's Negligence

101.    Seyfarth acted negligently and failed to act with the reasonable skill and care expected of an international law firm purportedly experienced in corporate M&A and tax.

102.    *First*, in relation to the Additional Payments, Seyfarth negligently:

a.    Failed to consider, research or consult with an English-qualified lawyer on (i) the provisions governing the Additional Payments, (ii) the practical effect of the removal of the Buyer's Proposed Undertakings during the negotiation process, or (iii) the limited role of implied duties of good faith in English contract law and their inapplicability to business sale agreements generally;

b.    Failed to advise Plaintiffs that the BPA allowed Inflexion to prevent Plaintiffs from earning the Additional Payments (even if that meant refusing business opportunities without any commercial justification) and included a very narrow definition of the Revenues that would count towards the earn-out thresholds; and

c.    Failed to advise Plaintiffs on the significance of the definition of Revenue and its impact on Mr. Naithani's and the Medmeme Plaintiffs' ability to achieve the Earn Out; and

    d. Failed to ensure that proposals made by Inflexion in the LOI for Mr. Naithani to retain rights to use the Medmeme Plaintiffs' data after the sale were documented in the BPA.

103. *Second*, in relation to the litigation against Mr. Moulding, Seyfarth negligently:

    a. Failed to disclose that its negligence with respect to the Additional Payments created a conflict of interest that precluded it from acting in this litigation;

    b. Provided incorrect advice as to the chances this claim would survive a motion to dismiss; and

    c. Provided incorrect advice as to the viability of an appeal of the district court's dismissal of the complaint against Mr. Moulding.

104. *Third*, in relation the Warranties, Seyfarth negligently:

    a. Failed to advise Mr. Naithani of his unlimited personal liability for breach of the Warranties and of the risk that PGL could seek to recover against him without offsetting any money obtained under the W&I Policy;

    b. Failed to specifically identify in the BPA (i) what would constitute Management Accounts for purposes of the Warranties or (ii) what accounting standards were historically used by the Plaintiffs in its internal financial records;

    c. Failed to explain to Plaintiffs that the Warranties were vague and likely to give rise to a dispute; and

    d. Failed to advise Plaintiffs to obtain a qualified accountant's advice on whether their Management Accounts and other financial records complied with the Warranties.

105. *Fourth*, in relation to the LNI and Loan Notes, Seyfarth negligently:

    a. Permitted the LNI to be drafted in a way that gave Pharmaspectra US LLC unlimited ability to vary the priority of the Loan Notes to Plaintiffs' detriment;

    b. Failed to request or seek a copy of the Priority Notes or Facilities Agreements before agreeing to the LNI;

    c. Failed to advise Plaintiffs of the risks that the Loan Notes' principal would not be repaid in full or in part and the risk that the annual interest payment would be deferred; and

    d. Failed to advise Plaintiffs of the risks posed by the subordination of the Loan Notes to the Priority Notes, Facilities Agreements and other debts.

102.  *Fifth*, in relation to the Indian sale, Seyfarth negligently:

   a.  Failed to advise the Plaintiffs on a tax-efficient method of structuring an investment of the Indian sale proceeds into Prism;

   b.  Failed to protect the Plaintiffs' late payment of the Indian purchase price, or to ensure the deal was structured to require completion to be conditional on the simultaneous payment of the Indian purchase price;

   c.  Failed to ensure that any disputes in relation to the Indian sale could be resolved in the same place as disputes relating to other aspects of the Transaction (i.e. England), to avoid a multiplicity of litigation in different jurisdictions.

## IV.   Seyfarth's Negligence Proximately Caused Injury to Plaintiffs

106.   The above breaches by Seyfarth of its duty of care to the Plaintiffs have proximately caused the Plaintiffs' loss and damage.

107.   But for Seyfarth's negligence in relation to the Additional Payments, Mr. Naithani and the Medmeme Plaintiffs would have:

   a.  Refused to agree to the removal of the Buyer's Proposed Undertakings from the BPA and/or insisted an equivalent express good faith requirement be included;

   b.  Insisted upon a substantially larger upfront cash payment; or

   c.  Declined to move forward with the transaction with Inflexion.

108.   But for Seyfarth's negligence in relation to the litigation against Mr. Moulding, Plaintiff PS US LLC would not have brought suit against Mr. Moulding and would not have paid the associated legal fees to Seyfarth.

109.   But for Seyfarth's negligence in relation to the Warranties, the Medmeme Plaintiffs and Mr. Naithani would have:

   a.  Not provided the Warranties at all;

   b.  Instructed a qualified accountant to prepare a set of accounts which the Medmeme Plaintiffs would have signed and provided as the Management Accounts for purposes of the Warranties;

     c.     Instructed Seyfarth to give the term "Management Accounts" a non-ambiguous definition in the BPA and to define precisely the applicable accountancy standards that would be applied to the Medmeme Plaintiffs' financial records;

     d.     Limited Mr. Naithani's personal liability for breaches of the Warranties to the same extent as the Medmeme Plaintiffs; or

     e.     Declined to move forward with the Transaction with Inflexion.

110.     But for Seyfarth's negligence in relation to the Loan Notes and the LNI, Mr. Naithani and the Medmeme Plaintiffs would have:

     a.     Refused to consent to the terms of the LNI or refused to accept the Loan Notes as part of the purchase price for the Business; or

     b.     Declined to move forward with the Transaction with Inflexion.

111.     But for Seyfarth's negligence in relation to the Indian sale, the Plaintiffs would have:

     a.     Insisted on a simultaneous exchange of sold assets and purchase price at closing;

     b.     Established an offshore corporate structure in a low- or nil-tax jurisdiction into which the Indian sale proceeds could have been indirectly invested without having to first remit the sale proceeds to the US;

     c.     Enjoyed the benefit of full capital gains tax relief on the Indian sale proceeds; or

     d.     Declined to move forward with the Transaction with Inflexion.

112.     Because of Seyfarth's negligence, Plaintiffs have suffered a variety of ascertainable losses:

     a.     The sale of the Business at tens of millions of dollars less than it was worth;

     b.     The loss of the opportunity to sell the Business to another buyer on more favorable terms;

     c.     A substantial decrease in the value of the Medmeme Plaintiffs;

     d.     Directly foreseeable consequential loss of profits as a result of losing the additional funds that should have been obtained from the sale of the Business;

e.  Loss of opportunity to invest into Prism the additional funds that should have been obtained from the sale of the Business and the sale of the proceeds that should have been obtained sooner and/or that should have been investable gross (not net of taxes), and a directly foreseeable consequential loss of profits for Prism and diminution in Prism's value;

f.  Avoidable US tax charges;

g.  Avoidable Indian tax charges;

h.  Unnecessary legal fees of about $400,000 in connection with Inflexion's delay in paying the Indian purchase price and tax issues arising from the Indian sale.

i.  Unnecessary legal costs of about $320,000 incurred by Plaintiffs in connection with disputes with Inflexion over the Additional Payments;

j.  Unnecessary legal costs of about $180,000 incurred by Plaintiffs in connection with the litigation against Mr. Moulding;

k.  Unnecessary legal and other litigation costs of about $1,530,000 incurred by Plaintiffs in connection with the Escrow Claim and Warranty Counterclaim; and

l.  Unnecessary legal and other costs of about $24,000 incurred by Plaintiffs in connection with the Loan Note Dispute.

## **FIRST CAUSE OF ACTION**

### **(Legal Malpractice)**

113.   Plaintiffs repeat and re-allege each and every allegation set forth in the preceding paragraphs as if fully set forth here.

114.   In or around March 2019, Plaintiffs entered into an attorney-client relationship with Seyfarth.  As Plaintiffs' attorneys, Seyfarth owed the Plaintiffs a duty to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession.

115.   Seyfarth breached this duty by, among other things, (i) failing to ensure that the BPA reflected the terms that Plaintiffs agreed to, (ii) failing to advise Plaintiffs that the structure of the BPA made it highly unlikely that the Additional Payments would ever be paid, (iii) failing to limit the risk that the Warranties would be breached and failing to limit in any way Mr.

Naithani's personal liability for the same, (iv) failing to advise Plaintiffs that the LNI permitted capitalization of the annual interest payment and further subordination of the Loan Notes, and (v) failing to advise Plaintiffs on a tax-efficient structure for the Indian sale or on the risks of late payment of the Indian purchase price.

116.   Seyfarth's failure to exercise the ordinary reasonable skill and knowledge commonly possessed by a member of the legal profession proximately caused the Plaintiffs to suffer actual and ascertainable damages as outlined in Section IV above.

<u>**DEMAND FOR RELIEF**</u>

WHEREFORE, Plaintiffs demands judgement against Seyfarth awarding them:

a.   Damages in an amount to be determined at trial, but at least $13.5 million;

b.   Pre- and post-judgment interest at the maximum rate allowed by law; and

c.   Such other and further relief as this Court deems just and proper.

Dated: February 6, 2023

CANDEY LLC

By: /s/ Joshua L. Ray
      Joshua L. Ray (NY Bar No. 4818126)
      630 Fifth Avenue
      20th Floor
      New York, NY 10111
Tel.: (718) 957-8884

*Attorneys for Plaintiffs M3 Cubed US LLC,*
*PS US LLC, MIS US LLC, Prism Science*
*LLC and Mahesh Naithani*